UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE CELLULAR DEVICE ASSIGNED 203-214-6669 | Case No. 3:18mj-1475(RMS)<br><br>September 21, 2018<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT AND AN ORDER PURSUANT TO 18 U.S.C §§ 3122 AND 3123**

I, Christopher Alvarado, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain cellular device assigned **203-214-6669** (the "SUBJECT PHONE"), which is a prepaid phone with no subscriber information, that is in the custody or control of AT&T (the "Service Provider"), a wireless communications service provider that is headquartered at 208 S. Akard Street, Dallas, TX 75202.  As a provider of wireless communications service, the Service Provider is a provider of an electronic communications service, as defined in 18 U.S.C. § 2510(15).

2.      The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) and Federal Rule of Criminal Procedure 41 to require the Service Provider to disclose to the government the information further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

3.      Because I am seeking the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), I also make this affidavit in support of an application by the United States of America for an order pursuant to 18 U.S.C §§ 3122 and 3123, authorizing the installation and use of pen registers and trap and trace devices (pen-trap devices) to record, decode, and/or capture dialing, routing, addressing, and signaling information associated with each communication to or from the SUBJECT PHONE .

4.      I am a Police Officer with the City of New Haven Police Department in Connecticut (NHPD) and also serve as a Task Force Officer with the FBI.  I have been employed by NHPD since April of 2010. From August of 2015 to the present, I have been assigned to the FBI's Safe Streets Task Force in New Haven. The FBI is the lead agency in that Task Force which is comprised of Federal and local law enforcement personnel, and which is tasked with investigating violent crime in the City of New Haven and surrounding communities. As such, my duties include, among other things, investigating violations of Titles 18 and 21 of the United Stated Code, such as drug trafficking offenses. I am authorized to make arrests for violation of those Titles.

5.      During my experience in law enforcement, I have participated in investigations of diverse crimes, including investigations involving the illegal distribution of controlled substances.  In connection with these investigations, I have executed search and arrest warrants. I have also been involved in controlled purchases of illegal drugs utilizing cooperating sources; conducted electronic and physical surveillance of individuals involved in illegal drug distribution; and debriefed cooperating sources and drug distributors, as well as other local, state and federal law enforcement officers, regarding the manner and means employed by narcotics

traffickers, including the manner and means by which narcotics traffickers communicate, and those methods employed by narcotics traffickers in an effort to avoid detection by law enforcement.

6.      From my training and experience, I know that narcotics traffickers often use wireless telephones, and often speak to one another using coded, cryptic or slang words and phrases, in the belief that by doing so they can thwart the efforts of law enforcement to identify them and their activities and to seize their drugs, guns and/or other assets.  I also know that such individuals often frequently "drop" or "change" their cellular telephones, i.e. terminate usage of one cellular telephone and begin usage of a new cellular telephone, in an attempt to thwart the efforts of law enforcement, and often possess and use multiple cellular telephones interchangeably for the same reason.  Furthermore, I know that drug traffickers and the couriers and transporters that work for sources of supply often compartmentalize operations by using different phones to communicate with different re-distributors so that if one part of the distribution operation is compromised by law enforcement, other aspects of the operation remain intact.  The use of multiple cell phones at the same time is one way to achieve such compartmentalization.  I and other law enforcement officers that I have work with in drug investigations have had the opportunity to obtain search warrants for cell phones in the past.  The execution of these search warrants has resulted in the recovery of, among things, text messages, photographs, WhatsApp messages and phone contacts that have constituted evidence of drug trafficking.

7.      The facts in this affidavit come from information obtained from cooperating sources, my personal observations, my training and experience, my review of documents, and

information obtained from other agents and witnesses.  This affidavit is intended to show merely

that there is probable cause for the requested warrant and does not set forth all of my knowledge

about this matter.

8.     The United States, including the FBI, is conducting a criminal investigation of

Herman BELLAMY aka "Aug" (hereinafter referred to as BELLAMY), Eric WILSON aka

"King 40" (hereinafter referred to as WILSON), and Cornellius IVORY aka "Smookie"

(hereinafter referred to as IVORY) regarding violations of Title 21 U.S.C. §§ 841 and 846.

Based on the facts set forth in this affidavit, there is probable cause to believe that violations of

21 U.S.C. §§ 841(a)(1) (distribution of narcotics, possession with intent to distribute narcotics);

846 (conspiracy to distribute and possess with intent to distribute narcotics); and 843(b) (Use of

a Communication Facility to Facilitate a Narcotics Trafficking Felony) (hereafter referred to as

the "Target Offenses") have been committed, are being committed, and will be committed by

BELLAMY, WILSON, IVORY and others yet identified.  There is also probable cause to search

the information described in Attachment A for evidence, instrumentalities, contraband, or fruits

of these crimes as further described in Attachment B.

9.     The Court has jurisdiction to issue the proposed warrant because it is a "court of

competent jurisdiction" as defined in 18 U.S.C. § 2711.  Specifically, the Court is a district court

of the United States that has jurisdiction over the offense being investigated; *see* 18 U.S.C.

§ 2711(3)(A)(i).

## PROBABLE CAUSE

10.     A Cooperating Source[1] (designated in this investigation as CS-1) reported that in

or about January 2018, before s/he worked with the FBI and New Haven Police Department

(NHPD), s/he bought heroin from BELLAMY. CS-1 reported s/he would call telephone number

203-214-6669, and either BELLAMY, WILSON, or IVORY, would pick up the phone and

subsequently sell CS-1 heroin, typically a bundle of heroin at a time.  CS-1 reported BELLAMY,

WILSON, AND IVORY, share a common drug phone (203-214-6669) and take turns possessing

the phone for their customers. CS-1 reported BELLAMY is the main person who predominantly

uses the phone.

11.     On July 12, 2018, utilizing CS-1, the FBI SSTF and the New Haven Police

Department conducted a controlled purchase of heroin from an unknown male, who was with

BELLAMY and WILSON. Agents met CS-1 at a prearranged meeting location in New Haven.

In the presence of agents, CS-1 placed a phone call to **203-214-6669.**  The call was placed on

speakerphone and recorded. A male, who CS-1 believed to be BELLAMY, answered and

advised CS-1 to go to the Taurus Café located at 520 Winchester Avenue where he would meet

him/her.

12.     Following the call, CS-1's person and vehicle were searched by agents. Both

searches were negative for contraband or money. CS-1 was provided with $60 in official

government funds and a recording device for the purposes of effecting the anticipated controlled

purchase from BELLAMY.

---

[1] CS-1 has only provided information to law enforcement for a short period of time, but investigators have
corroborated some of his/her reporting during that time, and accordingly, CS-1 is believed to be accurate and
reliable. CS-1 is cooperating for monetary compensation.

13.     A short time later, CS-1 departed the area and proceeded to the location where
s/he had arranged to meet BELLAMY. According to CS-1, the following occurred.  BELLAMY
handed an unknown male (10) ten white wax folds, each stamped "USA Power", and each of
which contained an off-white powder like substance of suspected heroin. The unknown male in
turn, handed the suspected heroin to CS-1 in exchange for $60. Thereafter, CS-1 drove back to a
pre-determined location, met with agents, and turned over the suspected heroin.  Agents searched
CS-1 and his/her vehicle again, with negative results. Agents tested a portion of the off-white
powder like substance, which resulted in a positive reaction for suspected heroin. Agents later
reviewed the recording CS-1 utilized during the controlled purchase, which corroborated his/her
reporting.

14.     On July 24, 2018, utilizing CS-1, the NHPD conducted a controlled purchase of
heroin from IVORY.   NHPD detectives and officers met CS-1 at a prearranged meeting location
in New Haven.  In the presence of the NHPD, CS-1 placed a phone call to **203-214-6669.**  The
call was placed on speakerphone. A male, who CS-1 believed to be IVORY, answered and
advised CS-1 to go to the area of Mansfield Street where he would meet him/her.

15.     Following the call, CS-1's person and vehicle were searched, which were
negative for contraband or money. CS-1 was provided with $40 in official government funds and
a recording device for the purposes of effecting the anticipated controlled purchase from
IVORY.

16.     A short time later, CS-1 departed the area and proceeded to the location where
s/he had arranged to meet IVORY. According to CS-1, the following occurred. IVORY, who
was driving a black Acura TL bearing CT registration AK-22905, registered to IVORY, advised
CS-1 to follow him. Once parked at the intersection of Sheffield Avenue and Starr Street,

IVORY directed CS-1 to enter his vehicle. Once inside the vehicle, CS-1 told IVORY s/he needed "half", referring to one half bundle of heroin, or five wax folds, and handed IVORY $40 of official government funds.  In exchange, IVORY handed CS-1 (5) five white wax folds, each stamped "HARVEY", and each of which contained an off-white powder like substance. Thereafter, CS-1 drove back to a pre-determined location, met with NHPD detectives and officers, and turned over the suspected heroin. CS-1 and his/her vehicle were again searched with negative results. NHPD detectives and officers tested a portion of the off-white powder like substance, which resulted in a positive reaction for suspected heroin.  The recording device of the interaction corroborated CS-1's reporting.

17.     On August 2, 2018, utilizing CS-1, the NHPD conducted a controlled purchase of heroin from BELLAMY. NHPD detectives and officers met CS-1 at a prearranged meeting location in New Haven.  In the presence of NHPD detectives and officers, CS-1 placed a phone call to **203-214-6669.**  The call was placed on speakerphone. A male, who CS-1 believed to be BELLAMY, answered and advised CS-1 to go to the area of Mansfield Street where he would meet him/her.

18.     Following the call, CS-1's person and vehicle were searched, with negative results for contraband or money. CS-1 was provided $60 in official government funds and a recording device for the purposes of conducting the anticipated controlled purchase from BELLAMY.

19.     A short time later, CS-1 departed the area and proceeded to the location where s/he had arranged to meet BELLAMY. According to CS-1, the following occurred. BELLAMY, who was driving a white Nissan Maxima bearing CT registration AF-85401, registered to Lorraine BELLAMY, advised CS-1 to follow him. Once parked at the intersection of Sheldon

Terrace and Starr Street, CS-1 entered the rear passenger seat of the white Nissan. CS-1

identified the driver of the vehicle as BELLAMY, and the passenger as WILSON. CS-1 told

BELLAMY s/he needed "1", referring to a bundle of heroin, or ten wax folds, and handed

BELLAMY $60 of official government funds, and in exchange, BELLAMY handed CS-1 (10)

ten white wax folds, each stamped "HARVEY", and each of which contained an off-white

powder like substance. Thereafter, CS-1 drove back to a pre-determined location, met with

NHPD detectives and officers, and turned over the suspected heroin. CS-1 and his/her vehicle

were again searched, which yielded negative results. A portion of the off-white powder like

substance was tested, which resulted in a positive reaction for suspected heroin. The recording

of the interaction corroborated CS-1's reporting.

20.     On September 17, 2018, utilizing CS-2, the FBI SSTF and the New Haven Police

Department conducted a controlled purchase of heroin from IVORY. Agents met CS-2 at a

prearranged meeting location in New Haven. In the presence of agents, CS-2 placed a phone call

to 203-214-6669. The call was placed on speakerphone and recorded. A male, who CS-2

believed to be IVORY, answered and advised CS-2 to go to the area of Starr Street where he

would meet him/her.

21.     Following the call, CS-2's person and vehicle were searched, with negative

results for contraband or money. CS-2 was provided $60 in official government funds and a

recording device for the purposes of conducting the anticipated controlled purchase from

IVORY.

22.     A short time later, CS-2 departed the area and proceeded to the location where

s/he had arranged to meet IVORY. According to CS-2, the following occurred. IVORY, who

was driving a black Acura TL bearing CT registration AK-22905, registered to IVORY, advised

CS-2 to follow him. Based on the fact that IVORY appeared shortly after CS-2 called the target

telephone (203-214-6669,) I believe that IVORY was likely traveling with the target telephone to

the meet location. Once parked at the intersection of Mansfield Street and Starr Street, IVORY

directed CS-2 to enter his vehicle. Once inside the vehicle, CS-2 told IVORY s/he needed "1",

referring to one bundle of heroin, or ten wax folds, and handed IVORY $60 of official

government purchase funds.  In exchange, IVORY handed CS-2 (10) ten white wax folds, each

stamped "HARVEY", and each of which contained an off-white powder like substance,.

Thereafter, CS-2 drove back to a pre-determined location, met with agents, and turned over the

suspected heroin.  CS-2 and his/her vehicle were again searched, which yielded negative results.

A portion of the off-white powder like substance was tested, which resulted in a positive reaction

for suspected heroin.  The recording corroborated CS-2's reporting.

23.     Based upon all of the foregoing facts, as well as my training and experience, I

believe that there is probable cause to believe that BELLAMY, WILSON and IVORY are

currently utilizing the SUBJECT PHONE in furtherance of drug trafficking activity and that the

requested information will help investigators locate the SUBJECT PHONE and also lead to

evidence of the Target Offenses.  The location of the SUBJECT PHONE is likely to lead to the

discovery of evidence of drug trafficking activity, including potential stash locations, and to the

identification of other co-conspirators.  In my training and conversations with other law

enforcement officers familiar with drug trafficking activity, drug traffickers usually carry their

cell phone(s) on their person to narcotics transactions to facilitate the meeting, to communicate

with the associates they intend to meet with on an ongoing basis, and to keep track of the

whereabouts of their associates en route to a meet location and while they are at their stash

locations.  Having the cell phone on their person allows the meet location to be changed very

quickly or set at the last moment, which is often a counter-surveillance ploy.  In addition, having

the cell phone(s) on their person allows them to conduct business more efficiently and while on

the move even when they visit stash locations or sources of supply.  In addition, having a cell

phone on their person also allows a drug trafficker to arrange other transactions while going to

one transaction to ensure a consistent flow of business.

24.     An administrative subpoena for subscriber information for 203-214-6669

confirmed the provider is AT&T and that the SUBJECT PHONE is a prepaid phone with no

subscriber information.

25.     In my training and experience, I have learned that the Service Provider is a

company that provides cellular communications service to the general public.  I also know that

providers of cellular communications service have technical capabilities that allow them to

collect and generate information about the locations of the cellular devices to which they provide

service, including cell-site data, also known as "tower/face information" or "cell tower/sector

records."  Cell-site data identifies the "cell towers" (*i.e.*, antenna towers covering specific

geographic areas) that received a radio signal from the cellular device and, in some cases, the

"sector" (*i.e.*, faces of the towers) to which the device connected.  These towers are often a half-

mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas.

Furthermore, the tower closest to a wireless device does not necessarily serve every call made to

or from that device.  Accordingly, cell-site data provides an approximate general location of the

cellular device.

### Cell-Site Data

26.     Based on my training and experience, I know that the Service Provider can collect

cell-site data on a prospective basis about the SUBJECT PHONE.  Based on my training and

experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication.   I also know that wireless providers such as the Service Provider typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

### E-911 Phase II / GPS Location Data

27.     I know that some providers of cellular telephone service have technical capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data or latitude-longitude data.  E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers.  As discussed above, cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected.  These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.  Accordingly, cell-site data is typically less precise that E-911 Phase II data.

28.     Based on my training and experience, I know that the Service Provider can collect E-911 Phase II data about the location of the SUBJECT PHONE, including by initiating a signal

to determine the location of the SUBJECT PHONE on the Service Provider's network or with such other reference points as may be reasonably available.

## Pen-Trap Data

29.     Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it.  Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number (ESN), a Mobile Electronic Identity Number (MEIN), a Mobile Identification Number (MIN), a Subscriber Identity Module (SIM), a Mobile Subscriber Integrated Services Digital Network Number (MSISDN), an International Mobile Subscriber Identifier (IMSI), or an International Mobile Equipment Identity (IMEI).  The unique identifiers – as transmitted from a cellular device to a cellular antenna or tower – can be recorded by pen-trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content.

## AUTHORIZATION REQUEST

30.     Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41 as, based on the facts set forth above, I believe that the location of the SUBJECT PHONE will lead to evidence of drug trafficking offenses.  I also request that the Court authorize the use of a pen register and trap and trace device as the information sought is material and relevant to an on-going investigation into drug trafficking offenses.

31.     I further request that the Court direct the Service Provider to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.

32.     I also request that the Court direct the Service Provider to furnish the government

all information, facilities, and technical assistance necessary to accomplish the collection of the

information described in Attachment B unobtrusively and with a minimum of interference with

the Service Provider's services, including by initiating a signal to determine the location of the

SUBJECT PHONE on the Service Provider's network or with such other reference points as may

be reasonably available, and at such intervals and times directed by the government.  The FBI

shall reasonably compensate the Service Provider for reasonable expenses incurred in furnishing

such facilities or assistance.

33.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal

Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until

30 days "after the collection authorized by the warrant has been completed.  There is reasonable

cause to believe that providing immediate notification of the warrant may have an adverse result,

as defined in 18 U.S.C. § 2705.  Providing immediate notice to the subscriber or user of the

SUBJECT PHONE would seriously jeopardize the ongoing investigation, as such a disclosure

would give that person an opportunity to destroy evidence, change patterns of behavior, notify

confederates, and flee from prosecution.  *See* 18 U.S.C. § 3103a(b)(1).  As further specified in

Attachment B, which is incorporated into the warrant, the proposed search warrant does not

authorize the seizure of any tangible property.  *See* 18 U.S.C. § 3103a(b)(2).  Moreover, to the

extent that the warrant authorizes the seizure of any wire or electronic communication (as

defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable

necessity for the seizure for the reasons set forth above.  *See* 18 U.S.C. § 3103a(b)(2).

34.     Because the warrant will be served on the Service Provider, who will then

compile the requested records at a time convenient to it, reasonable cause exists to permit the

execution of the requested warrant at any time in the day or night.  I further request that the

Court authorize execution of the warrant at any time of day or night, owing to the potential need

to locate the SUBJECT PHONE outside of daytime hours.


Respectfully submitted,

CHRISTOPHER ALVARADO
TASK FORCE OFFICER, FBI


Subscribed and sworn to before me on ____September 21____, 201 8


/s/ Robert M. Spector

HON. ROBERT A. SPECTOR
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Property to Be Searched

1. Records and information associated with the cellular device assigned 203-214-6669 (referred to herein and in Attachment B as "the SUBJECT PHONE"), which is a prepaid phone with no subscriber information, that is in the custody or control of AT&T (the "Service Provider"), a wireless communications service provider that is headquartered at 208 S. Akard Street, Dallas, TX 75202.

2. The SUBJECT PHONE.

## ATTACHMENT B

### Particular Things to be Seized

**I. Information to be Disclosed by the Provider:**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

1. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the SUBJECT PHONE for a period of 30 days from the date of the warrant, including:

   a. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

   b. information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received).

2. Information associated with each communication to and from the SUBJECT PHONE for a period of 30 days from the date of the warrant, including:

   a. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

   b. Source and destination telephone numbers;

   c. Date, time, and duration of communication; and

    d.  All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the SUBJECT PHONE will connect at the beginning and end of each communication.

3.  Information about the location of the SUBJECT PHONE for a period of 30 days, during all times of day and night.  "Information about the location of the SUBJECT PHONE" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information

    a.  To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Provider, the Provider is required to disclose the Location Information to the government.  In addition, the Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Provider's services, including by initiating a signal to determine the location of the SUBJECT PHONE on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.  The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

    b.  In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information.  *See* 18 U.S.C. § 3103a(b)(2).

        **4.**  This warrant does not authorize the seizure of any tangible property or the contents of any communications.

**II. Information to be Seized by the Government:**

All information described above in Section I that constitutes evidence, fruits, contraband, and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (distribution of narcotics, possession with intent to distribute narcotics); 846 (conspiracy to distribute and possess with intent to distribute narcotics); and 843(b) (Use of a Communication Facility to Facilitate a Narcotics Trafficking Felony) involving HERMAN BELLAMY, ERIC WILSON and CORNELLIUS IVORY and others yet to be identified during the thirty day period from the date of the warrant.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC
## RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE
## 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws

of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in

this certification is true and correct.  I am employed by AT&T and my title is

_____.  I am qualified to authenticate the records attached hereto

because I am familiar with how the records were created, managed, stored, and retrieved.  I state

that the records attached hereto are true duplicates of the original records in the custody of

AT&T.  The attached records consist of _____.

I further state that:

      a.     all records attached to this certificate were made at or near the time of the

occurrence of the matter set forth by, or from information transmitted by, a person with

knowledge of those matters, they were kept in the ordinary course of the regularly conducted

business activity of AT&T, and they were made by AT&T as a regular practice; and

      b.     such records were generated by AT&T's electronic process or system that

produces an accurate result, to wit:

         1.     the records were copied from electronic device(s), storage medium(s), or

file(s) in the custody of AT&T in a manner to ensure that they are true duplicates of the original

records; and

         2.     the process or system is regularly verified by AT&T, and at all times

pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____        _____
Date                                     Signature